Filed 2/22/24  P. v. Saldivar CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E081789 |
| v. | (Super.Ct.No. FSB025636) |
| ERIC SALDIVAR, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Harold T. Wilson, Jr., Judge.  Reversed.

Matthew A. Lopas, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Christine Y. Friedman and Eric A. Swenson, Deputy Attorneys General, for Plaintiff and Respondent.

1

In 2001 defendant and appellant Eric Henry Saldivar was found guilty of first degree murder for shooting a man in the back as he ran away from him.  Defendant was sentenced to 100 years to life, plus 10 years.  In 2023, defendant was diagnosed with advanced decompensated cirrhosis of the liver, which was described by doctors at the Department of Corrections and Rehabilitation (CDCR) as an advanced illness with an end-of-life trajectory.  In  April 2023, the CDCR recommended to the trial court that it determine whether defendant was entitled to recall of his sentence and compassionate release pursuant to Penal Code section 1172.2.[1]  The trial court denied the request finding that it had not been shown that defendant suffered from a medical condition with an end-of-life trajectory and that, regardless, he posed a threat to the community if he was released.

Defendant contends we must reverse the trial court's order.  He insists that section 1172.2 creates a presumption requiring the court to recall the sentence of an incarcerated person with a qualifying medical condition unless the court finds that the person poses an unreasonable risk of danger to public safety.  The trial court erred by insisting on a timeline for defendant's end of life, which was not a requirement of section 1172.2, and failed to apply the proper standard for determining whether he posed an unreasonable risk to public safety should he be released.  We find that the trial court abused its discretion because its findings were not supported by the evidence.  We reverse and remand for the trial court to recall defendant's sentence.

---

[1]  All further statutory references are to the Penal Code unless otherwise indicated.

## FACTUAL AND PROCEDURAL HISTORY

### A.      UNDERLYING FACTS AND CONVICTION

The facts are taken from the previous unpublished opinion on direct appeal in *People v. Gerard Gutierrez, et al.,* case No. E030483, filed on November 27, 2022 (Opinion).[2]  Sometime between 4:00 and 4:30 p.m., on February 22, 2001, defendant shot the victim twice in the back as the victim ran down O Street in Colton.  Gerard Gutierrez drove the getaway car.  The victim told responding law enforcement officers that defendant had shot him.  The victim died approximately one hour later. Gutierrez and defendant were later spotted driving on the freeway; pursuing law enforcement activated their lights and sirens.  Prior to Gutierrez pulling over the car, defendant threw a handgun out the window.  The handgun was recovered and contained three live and three spent rounds.  Gang expert testimony was presented that defendant was a member of the Mexican Mafia and that the Mexican Mafia had authorized the killing of the victim for being an informant and for committing sexual offenses.

Defendant was charged with first degree murder (§ 187) and personally and intentionally discharging a firearm causing great bodily injury or death (§ 12022.53, subd. (d)).  It was further alleged that the crime was committed on behalf of, and to benefit, a criminal street gang (§ 186.22, subd. (b)(1)), and that defendant had suffered three prior serious and violent felony convictions within the meaning of section 667, subdivision (a)(1), (b) through (i), and section 1170.12, subdivisions (a) through (d).  A

---

[2]  The Opinion has been made part of the record on appeal and we cite to it from the clerk's transcript.

3

jury found defendant guilty of first degree murder; and the section 12022.53, subdivision (d), weapons-use enhancement was found true. The jury found the gang allegation not true. The trial court found the prior conviction allegations true, but struck one of the prior convictions at sentencing. Defendant was sentenced to a determinate term of 10 years on the section 667, subdivision (a)(1), prior convictions, and an indeterminate term of 100 years to life. Defendant's conviction was affirmed on appeal.

B. <u>RECOMMENDATION FROM CDCR TO RECALL DEFENDANT'S SENTENCE</u>

On April 26, 2023, a letter was submitted to the trial court that was authored by Dr. Joseph Bick, who was the director of health care services for the CDCR. Dr. Bick recommended that defendant's current prison commitment and sentence be recalled. Defendant was housed at the California Institution for Men (CIM). Dr. Bick provided that defendant "has been diagnosed with advanced incurable cirrhosis of the liver. His cirrhosis is considered to be decompensated. This means that he has developed dilated veins in his esophagus that are prone to bleed (esophageal varices), fluid that accumulates in his intraabdominal area (ascites), swelling of his legs (peripheral edema), and impaired cognitive functioning (hepatic encephalopathy). In addition, he has had episodes of severe life threatening infection due to his cirrhosis which have required intensive care unit hospitalization. This is an advanced illness with a clear and irreversible end of life trajectory. [Defendant] is permanently medically incapacitated and requires nursing assistance for activities of daily living. He is able to transfer to his bedside commode but

requires [a] walker to ambulate short distances. [Defendant]'s physical abilities are significantly limited."

The report submitted provided the details of defendant's current crimes and sentence. His disciplinary history in prison included nine serious rule violation reports, including—on several occasions—possession of a deadly weapon. If released, defendant would live with his sister. She was willing to care for defendant if he was released. Dr. Bick requested that if the trial court were to grant the compassionate release, the CDCR was seeking an order providing for release in 30 days so that the CDCR could ensure that his housing and medical needs could be met.

A diagnostic study and evaluation report was prepared by a correctional counselor at the CIM on April 18, 2023. It was signed by a parole representative and the warden of the prison. Defendant was 58 years old. He had received a sentence of 110 years to life on November 6, 2001. His minimum parole eligibility date was August 15, 2082. A review of the electronic records management system revealed that defendant had an extended history of association and/or membership in the Mexican Mafia. The report outlined the current offense committed by defendant.

Defendant's criminal history included as follows: burglary in 1982 resulting in 12 months of probation; receiving stolen property in 1983 resulting in 36 months of probation; burglary and robbery in 1986 with a four-year state prison sentence; and attempted murder with the use of a firearm in 1990 with a 14-year state prison sentence.

Defendant was not participating in any mental health treatment while in prison custody. He used some medical equipment, including a four-wheeled walker. He was

5

listed as an inactive, monitored Mexican Mafia member. The report indicated that it was very difficult to become a member of the Mexican Mafia and that defendant had "devoted his life to this criminal organization to simply obtain the rank of membership." In 2015, he was offered an opportunity to participate in a "Step Down" program to cease promoting or being involved in the gang. Defendant refused to participate.

The report also detailed defendant's history in the penal system. He was assigned to a "Level IV" facility, which was the highest security designation in the CDCR. In 2016, he had to be assigned to the administrative segregation unit as he posed a threat to other inmates. In October 2018, he was involved in a physical altercation with another inmate. The same month he committed a battery on another inmate with a deadly weapon and was once again placed in the administrative segregation unit. In both 2020 and 2021, he was found guilty of possession of a deadly weapon. In 2020, he had an additional violation of disobeying an order. The report provided that defendant "continues to be involved in violent behavior and fails to adhere to laws and regulations." Defendant had participated in some work duties and took some anger management and substance abuse recovery group classes.

As for defendant's medical evaluation, the report provided the same information previously reported by Dr. Bick, that defendant had been diagnosed with advanced decompensated cirrhosis. It was described as an "advanced illness with an end of Life trajectory." He had multiple hospitalizations for liver failure complications. He required nursing assistance for activities of daily living. He used a walker to ambulate short distances. He could get to his bedside toilet but had difficulty walking short distances

6

due to abdominal distention. He was frail and a fall risk due to immobility and difficulty with coordination.

The diagnostic report listed the factors for consideration in granting compassionate release. Defendant was considered to have an advanced illness with an end-of-life trajectory. He was an inactive, monitored member of the Mexican Mafia. The report provided, "Releasing [defendant] to the community would provide an inherent risk to the civilian population. [Defendant]'s behavior within prison demonstrates [he] remains an active member of the [Mexican Mafia]. . . . With this complete lack of supervision, [defendant] could continue his acts of violence as he has within the prison facility." The report also noted that defendant had committed criminal acts prior to his incarceration "indicating he would potentially be a danger to the public if released." His criminal sophistication had increased with the most recent conviction for murder. "His violent offenses are recent which continues to cause concern in the institutional setting."

A "medical chrono" was also provided to the trial court, which had been prepared by Dr. Kirk Torres, chief physician and surgeon at the CIM, on January 19, 2023. It was also signed by Dr. Muhammad Farooq, chief medical executive at the CIM. Defendant was being housed in an outpatient housing unit. His illness was described as advanced decompensated cirrhosis, which was an advanced illness with end-of-life trajectory. There was no timeline as to the end of his life. Defendant filed a waiver of his right to be present at the recall of his sentence hearing and to release his medical information.

7

C.    RULING

The matter was first discussed on May 12, 2023, at a hearing on defendant's section 1172.6 petition (which was denied). The hearing on the issue of compassionate release was set for June 13, 2023, to accommodate defendant being present at the hearing if he chose to be present. The matter was then continued by stipulation on June 13, 2023, to June 20, 2023. The matter was again continued on June 20, 2023, to June 27, 2023, in order for defense counsel to obtain additional treatment and progress regarding defendant's medical diagnosis. On June 27, 2023, the matter was again continued by stipulation to July 7, 2023.

The matter was heard on July 7, 2023, without defendant present. Counsel for defendant submitted based on the filings in the case and presented no further evidence. The People objected to his release. The prosecutor argued that defendant's medical condition had been described as a "serious medical condition," but it was not clearly established that he was at the end of his life. There was no information as to how long defendant was expected to live. The prosecutor provided that defendant had been evaluated by a transplant specialist, which would significantly change defendant's outcome, but provided no further information.

The prosecutor further argued that it would be contrary to public safety to release defendant; he had been incarcerated since 2019. His criminal history included the attempted murder of two law enforcement officers. He was released in 1999 for those crimes, and soon thereafter committed the instant crimes. He had multiple infractions

8

while in custody. In 2020 and 2021, he had infractions for possession of a deadly weapon. The People presented no additional evidence.

The trial court stated it had considered the positions of both parties and reviewed the documents from the CDCR. These documents included the medical chrono and the diagnostic study. The trial court found, "First comments, Court[] concurs with the position of [the] People with respect to the end of life. Although it is noted within the California correctional health service letter that [defendant] suffers from an advanced illness with a clear irreversible end-of-life trajectory. There is no end of life or time line with respect [t]o that diagnosis. It is just a comment with respect to the medical condition."

The trial court then noted that it was concerned about the "threat to the community that [defendant] represents." The trial court reviewed defendant's criminal record, which spanned from 1985 until the current offenses in 2000. The trial court also believed that defendant was a member of the Mexican Mafia. "He has not been stepped out." The trial court further noted that defendant's disciplinary history within the penal system was "increasing and continuous." The trial court stated, "Of concern to the court noted that in 2020, there was a conviction for possession of a deadly weapon as 306 rule violation within the system, and in 2021 another possession of a deadly weapon, guilty as charged."

The trial court then referred to the diagnostic study. All three "individuals signed off indicating that [defendant] has committed criminal acts prior to his incarceration indicating he would potentially be a danger to the public if released." The trial court was

9

concerned that the "violent offenses" were recent and continued to be a concern in the institutional setting. The trial court noted that if the CDCR was concerned and felt that defendant "still represents a threat within their controlled, locked environment, then clearly, he would have the same threat level to the community if released at large."

The trial court concluded that "with respect to end of life, the timeline has not been provided or set forth." Further, it found that defendant would be a threat to the community if released based upon his prior record; his continuing, escalating violence; and the opinion of the three individuals in the diagnostic study from the CDCR that he still represented a threat within the penal system. The request for compassionate release was denied without prejudice. Defendant filed a notice of appeal from the denial of his section 1172.2 petition on July 24, 2023.

## DISCUSSION

Defendant contends on appeal that the trial court erred by applying an incorrect standard in denying the petition to recall his sentence. First, defendant insists that the medical evaluation provided by Dr. Bick provided sufficient evidence that defendant had a medical condition with an end-of-life trajectory. The trial court erred by finding that he had not met the criteria of a medical condition because there was no timeline as to his end of life, which is not required by section 1172.2. Further, the trial court did not consider in finding that defendant was a threat to society whether if he was released based on his "current condition" he would commit a "super strike" upon his release.

The People concede defendant has shown that he met the requirement for an advanced illness with an end-of-life trajectory as required by section 1172.2, subdivision

10

(b)(1). We will accept the concession and need not address the issue. The People insist the trial court impliedly found that defendant's release would pose an unreasonable risk of danger to public safety under the guidelines set forth in section 1172.2 and substantial evidence supports the determination.

Effective January 1, 2023, Assembly Bill No. 960 (2022-2023 Reg. Sess.) amended the substantive requirements and procedures governing the compassionate release of incarcerated persons. (Stats. 2022, ch. 744, §§ 1-3.) It essentially replaced all of subdivision (e) of section 1170[3], the provision formerly governing compassionate releases, with section 1172.2. (Stats. 2022, ch. 74, §§ 1-3.)[4]

Section 1172.2, subdivision (a) provides, "Notwithstanding any other law and consistent with paragraph (1) of subdivision (a) of Section 1170, if the statewide chief medical executive, in consultation with other clinical executives, as needed, determines that an incarcerated person satisfies the medical criteria set forth in subdivision (b), the [CDCR] shall recommend to the court that the incarcerated person's sentence be recalled." Section (b) of section 1172.2 provides, "There shall be a presumption favoring recall and resentencing under this section if the court finds that the facts described in

---

[3] Section 1170, subdivision (e), provided for compassionate release for those prisoners suffering from a terminal illness that could produce death within six months, and the release of the prisoner would not pose a threat to public safety. The trial court still retained the discretion to resentence or recall the sentence even when such medical condition was proven. (*People v. Torres* (2020) 48 Cal.App.5th 550, 556.)

[4] We refer to section 1172.2 effective January 1, 2024. (Stats. 2023, c. 131 (A.B. 1754), § 158, eff. Jan. 1, 2024.) It only has minor changes from the original version effective January 1, 2023.

paragraph (1) or (2) exist, which may only be overcome if a court finds the defendant is an unreasonable risk of danger to public safety, as defined in subdivision (c) of Section 1170.18, based on the incarcerated person's current physical and mental condition." Relevant here, section 1172.2, subdivision (b)(1), provides "The incarcerated person has a serious and advanced illness with an end-of-life trajectory. Examples include, but are not limited to, metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced end-stage dementia."

Section 1170.18, subdivision (c) provides, "As used throughout this code, 'unreasonable risk of danger to public safety' means an unreasonable risk that the petitioner will commit a new violent felony within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667." These new violent felonies are considered " 'super strikes.' " (*People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1150-1151.) "Those super strikes are murder, attempted murder, solicitation to commit murder, assault with a machine gun on a police officer, possession of a weapon of mass destruction, any serious or violent felony punishable by death or life imprisonment, or any sexually violent offenses or sexual offense committed against minors under the age of 14." (*Ibid.*)

We review for abuse of discretion the trial court's determination that a petitioner poses an unreasonable risk of danger to public safety. (See *Nijmeddin v. Superior Court* (2023) 90 Cal.App.5th 77, 83 (*Nijmeddin*).) "A trial court abuses its discretion when the factual findings critical to its decision find no support in the evidence." (*People v. Cluff* (2001) 87 Cal.App.4th 991, 998.)

In *Nijmeddin*, *supra*, 90 Cal.App.5th 77, the defendant was diagnosed with incurable pancreatic cancer and was expected to live for only one year. Despite his medical condition, "[t]he trial court declined to recall [the defendant's] sentence on the ground that he poses an unreasonable risk of danger to public safety. The court cited a variety of concerns, including [the defendant's] 'mental acuity . . . [¶] . . . his ability to continue to commit crimes . . . his ability to pick up a phone and obtain things that he might need to go somewhere or do something to be a risk of dangerousness to others.' " (*Id*. at p. 82.) On appeal, by way of a petition for writ of mandate, the Attorney General conceded that the trial court erred by refusing to recall defendant's sentence.

The appellate court agreed that the trial court had abused its discretion. The appellate court first noted, "It is undisputed that [the defendant] has a serious and advanced illness with an end-of-life trajectory, which means he is presumptively entitled to compassionate release." (*Nijmeddin*, *super*, 90 Cal.App.5th at p. 83.) The appellate court noted that the trial court made no findings as to "the unreasonable risk of commission of 'super strike' offenses; it simply expressed a generalized concern about petitioner's 'ability to commit crimes.' " (*Id.* at p. 83.) Further, the trial court failed to consider the defendant's current physical and mental condition. It found that a "generalized concern" that the person is able " 'to continue to commit crimes' " is insufficient to support a finding that the person is likely to commit a super strike "based on" the person's " 'current physical and mental condition.' " (*Ibid*.) The appellate court concluded that "[t]he record lacks any substantial evidence that [the defendant], who is severely physically incapacitated and getting worse by the day, 'is an unreasonable risk

13

of danger to public safety' [citation], as defined by section 1170.18, subdivision (c)." (*Ibid.*)

Here, defendant contends that the trial court erred by failing to apply the standard for determining whether to recall a sentence under section 1172.2. Specifically, the trial court required that there be a timeline for defendant's end-of-life trajectory despite section 1172.2 not requiring a specific timeline for end of life. Further, the trial court only found that defendant was a threat to the community and did not consider whether, based on his current physical and mental condition, posed an unreasonable risk to society that he would commit a "super strike." The People contend that the trial court impliedly found the factors in section 1172.2. The People insist the trial court is presumed to understand the law and apply it correctly, absent affirmative evidence in the record. Defendant counters that the trial court failed to make the requisite finding to overcome the presumption that his sentence should be recalled, and the order of the trial court should be reversed.

We agree with the People that we must presume the trial court was aware of the law and applied it to the determination of whether defendant was entitled to recall of his sentence. (*People v. Woods* (1993) 12 Cal.App.4th 1139, 1152 [reviewing court presumes trial court knew and properly applied the law; it is appellant's burden to rebut that presumption by an affirmative showing].) The record supports the trial court was aware of the factors in section 1172.2; section 1172.2 was mentioned at the first hearing on the recommendation from the CDCR that defendant's sentence be recalled. Further, the trial court stated at the final hearing that it had read the diagnostic report. That report

14

was entitled, "Diagnostic Study and Evaluation Report Pursuant to the Provisions of Penal Code section 1172.2." (All caps. omitted.) Finally, the trial court stated, "[W]ith respect to release pursuant to 1172.2, compassionate release, the Court finds there is not." Based on this record, we must presume the trial court was aware of the factors in section 1172.2 when considering whether to recall defendant's sentence. However, the trial abused its discretion when it declined to recall defendant's sentence.

The People have conceded that defendant met the first requirement of section 1172.2, subdivision (b)(1) that he had "a serious and advanced illness with an end-of-life trajectory." As such, there was a presumption that his sentence should be recalled and he be resentenced unless he posed an unreasonable risk of danger to public safety to commit a "super strike" based on his current physical and mental condition. (§ 1172.2, subd. (b).)

Here, the trial court found that based on defendant's prior record; his continuing, escalating violence; and the opinion of the three individuals in the diagnostic study from the CDCR; that he still represented a threat within the penal system, that defendant was a "threat to the community."

Here, as in *Nijmeddin,* the "trial court made no findings as to the unreasonable risk of commission of 'super strike' offenses; it simply expressed a generalized concern about petitioner's 'ability to continue to commit crimes.'" (*Nijmeddin*, *supra*, 90 Cal.App.5th at p. 83.) The trial court never found that defendant was at risk of committing a super strike. Further, the evidence did not support that defendant posed an unreasonable risk of committing a super strike. The three officials at the prison stated that defendant's release into the community would provide an "inherent risk to the civilian population" and he

15

would continue to commit acts of violence. However, these officials never stated that defendant posed an unreasonable risk of committing a "super strike" and never considered defendant's current physical condition.

Further, defendant's criminal record involved attempted murders involving law enforcement officers occurring in 1990. Defendant was released and immediately committed the current offense of shooting at the victim in the back as he ran away. The first degree murder in this case was committed in 2000, which was almost 23 years prior to the request for compassionate release. The trial court also referred to the fact that defendant was a member of the Mexican Mafia. The reports listed defendant as an "inactive monitored member." Further, the jury did not find that defendant committed the first degree murder on behalf of the gang, and the reports did not show that defendant had ever been convicted of a gang crime. While defendant may have been a member of the Mexican Mafia, there was no evidence of his current involvement and how it would result in him committing a "super strike" should he be released. Further, there was evidence that defendant had rules violations in 2020 and 2021 for possession of a deadly weapon but there is no evidence of the circumstances or the type of weapon possessed. Moreover, the two rule violations occurred almost two years prior to the request to recall his sentence and there was no evidence of any recent rule violations.

The above evidence does not support that, at the time of the recommendation by the CDCR to recall defendant's sentence in 2023, defendant posed an unreasonable risk of committing a "super strike" offense if he were to be released. This is further apparent based on his physical condition, as discussed *post*.

16

The reports stated that defendant was "permanently medically incapacitated" and was "frail and a fall risk." He required nursing assistance for activities of daily living. He could walk only short distances and used a walker. The People presented no other evidence that defendant was still capable of committing a "super strike" even with such diagnosis. There was no evidence of his ability to presumably handle a weapon to commit murder, or whether he had the capacity to conspire with another to commit some other "super strike."

Based on the foregoing, we conclude that there is no substantial evidence supporting the finding that defendant posed an unreasonable risk of committing a super strike if he was granted compassionate release. Because there is no substantial evidence that defendant poses an unreasonable risk of endangering public safety by committing a super strike offense, the presumption that his sentence be recalled has not been overcome. We accordingly conclude that the trial court abused its discretion by refusing to recall his sentence. Section 1172.2, subdivision (b), mandates that defendant's sentence be recalled.[5]

## DISPOSITION

We reverse the trial court's order refusing to recall defendant's sentence under section 1172.2 and direct the trial court to grant the petition and to recall defendant's

---

[5] We are empowered to "direct immediate issuance of a remittitur only on the parties' stipulation or on dismissal of the appeal under rule 8.244(c)(2)" of the California Rules of Court. (Cal. Rules of Court, rule 8.272(c)(1).) As such, we will simply reverse the trial court's orders denying compassionate release of defendant without ordering immediate issuance of the remittitur.

17

sentence.  We encourage the trial court to consider the original request by the CDCR that it be given 30 days to ensure defendant's housing and medical needs are met in granting the recall of his sentence.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
Acting P. J.

We concur:

CODRINGTON
J.

FIELDS
J.